JAP:NR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - X

**M-11-621**

UNITED STATES OF AMERICA

    -against-

BRANDON MEJIAS,

           Defendant.

- - - - - - - - - - - - - - - - - X

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(T. 18, U.S.C.,
§§ 922(a)(1)(A);
922(g)(1))

EASTERN DISTRICT OF NEW YORK, SS:

       ELI VITRANO, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

       In or about and between November 2010 and April 2011, both dates being approximate and inclusive, within the Eastern District of New York, the defendant BRANDON MEJIAS, not being a licensed importer, licensed manufacturer or licensed dealer of firearms, together with others, did knowingly engage in the business of dealing in firearms.

       (Title 18, United States Code, Section 922(a)(1)(A))

In or about and between November 2010 and April 2011, both dates being approximate and inclusive, within the Eastern District of New York, the defendant BRANDON MEJIAS, having previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, did knowingly and intentionally possess in and affecting commerce, firearms, to wit: (1)a TEC-9 handgun; (2)a Maverick 12 gauge shotgun; (3) a Marlin .22 caliber rifle; (4) J.P. Sauer .32 caliber pistol; and (5) a GSG .22 caliber pistol.

(Title 18, United States Code, Section 922(g)(1))

The source of your deponent's information and the grounds for his belief are as follows:[1]/

1.  I have been a Special Agent with ATF for approximately 16 years.  In this capacity, I am assigned to investigate firearms trafficking in the New York metropolitan area and elsewhere.  The information set forth in this complaint is based on my own observations, interviews with law enforcement officers, review of records of the ATF, and debriefings of other witnesses.

2.  On November 23, 2010, a paid confidential informant, who has proven to be reliable, (hereinafter the "CI"),

---

[1]/  Because the purpose of this affidavit is to establish only probable cause to arrest, I have not set forth a description of all the facts and circumstances of which I am aware.  All conversations are set forth in sum and substance and in part.

spoke via telephone with the defendant BRANDON MEJIAS.  During the call, which was electronically recorded, the CI spoke with the defendant, in substance and in part, about a future meeting with the CI to discuss the price and quantity of firearms that MEJIAS had to offer on behalf of an interested buyer known to the CI.  The defendant agreed to meet the following week.

3.  On or about Wednesday, December 1, 2010, a law enforcement officer working in an undercover capacity ("UC") and the CI subsequently met with MEJIAS at a pre-arranged location in the vicinity of 594 Fifth Avenue, Brooklyn, New York.  The meeting was electronically recorded.  The defendant identified himself as "Brandon."  The CI and UC told the defendant that the UC was seeking to purchase firearms and asked what guns MEJIAS could provide and at what price. MEJIAS indicated that he would have something for the UC by "Saturday afternoon."

4.  On December 3, 2010, the UC placed an electronically recorded call to MEJIAS.  The UC asked the defendant about the time and location of the firearms purchase and MEJIAS asked if the UC was still planning to come to the buy location.  The UC indicated he was on his way and MEJIAS instructed him to come to a prearranged location in Brooklyn, New York.

5.  Later in the evening of December 3, 2010, the UC and the CI met MEJIAS at a prearranged location in the vicinity

of Newkirk Avenue and East 28th Street in Brooklyn, New York.
The meeting was electronically recorded. MEJIAS entered an
undercover ATF vehicle (the "UC vehicle") and told the UC that he
had a source with a TEC-9 firearm for sale for $1300. MEJIAS
directed the UC to a nearby building where the defendant stated
an individual was waiting with the firearm. The UC refused to
leave the area and convinced MEJIAS to bring the firearm to the
UC vehicle. The defendant agreed to do so after receiving $100
in advance for arranging the transaction.

6. MEJIAS exited the UC vehicle and returned shortly
thereafter without the firearm. He told the UC that Don, last
name unknown" ("Don LNU"), was going to bring the firearm. The
UC parked the UC vehicle and MEJIAS called Don LNU to provide him
with the UC vehicle's location. Shortly thereafter, an
individual identified by the defendant as Don LNU entered the
rear passenger side of the UC vehicle. Don LNU indicated that he
did not have the firearm on his person and directed the UC to a
nearby building. The UC again declined to go to another location
and Don LNU agreed to bring the firearm to the UC vehicle. Don
LNU then exited the vehicle.

7. MEJIAS subsequently received a call from Don LNU
requesting that MEJIAS get the firearm and finish the transaction
with the UC. MEJIAS exited the UC vehicle and returned to the UC
vehicle after a short time with a plastic bag. MEJIAS removed a

black gun box from the bag and showed the UC a black TEC-9 and a magazine which were inside the gun box.  MEJIAS also provided the UC with a box of 9 caliber bullets (44 rounds in total).  The UC paid the defendant $1300 and, after a brief conversation, MEJIAS exited the UC vehicle.  MEJIAS subsequently called the UC and informed him that the box of 9 caliber bullets was an additional $50, and the UC informed MEJIAS that he would pay him the money the following week.

      8.   On December 9, 2010, the UC placed an electronically recorded call to MEJIAS and discussed, in sum and in part, making future firearm purchases.

      9.   On December 13, 2010, the UC placed an electronically recorded call to MEJIAS and discussed, in sum and in part, making future firearm purchases.

      10.   On January 11, 2011, the UC and CI drove to meet the defendant at a pre-determined location in the vicinity of 43rd Street and Fort Hamilton Parkway in Brooklyn, New York.  The UC was equipped with a transmitter and an electronic recording device and the subsequent meeting was recorded.

      11.   On the afternoon of January 11, 2011 the UC and CI met MEJIAS in the vicinity of 43rd Street and Fort Hamilton Parkway in Brooklyn, New York.  MEJIAS and another individual, identified as "Mess," entered the UC vehicle.  Mess opened his jacket and showed the UC a camouflage ballistic vest which he was

wearing beneath his jacket and asked the "so we are good?" and to
see "some money" for the shotgun and ballistic vest he was
selling. He indicated that he was selling a different ballistic
vest to the UC.

12. Mess indicated that both the vest and the shotgun
were inside a duffle bag in a building which he claimed was on
the same block. Mess asked the UC to go with him to get the bag
and the UC stated that he would not leave the UC vehicle. The UC
asked ~~the UC~~ Mess C.V. to bring the duffle bag to the UC vehicle. Mess
refused and the CI subsequently agreed to walk with Mess to
retrieve the duffle bag. At this point, both Mess and the CI
exited the UC vehicle.

13. MEJIAS remained in the UC vehicle with the UC. He
indicated that he knew Mess and that he had seen the shotgun,
which he described. The UC indicated that the price for the
shotgun and vest was too high, and MEJIAS indicated that Mess did
not want to reduce the price.

14. Shortly thereafter, Mess approached the UC
vehicle, followed by the CI, who was carrying a black duffle bag.
They entered the UC vehicle, and the CI opened the duffle bag.
The UC saw what appeared to be a shotgun with five shotgun shells
and a small blue ballistic vest. The UC paid Mess $1500 and Mess
replied "nice doing business with y'all." Mess and the defendant
then left the vehicle.

15.   On January 21, 2011, the UC and CI drove the UC vehicle to a pre-determined location in the vicinity of 42nd Street and 9th Avenue in Brooklyn, New York to meet MEJIAS.   The UC was equipped with a transmitter and an electronic recording device and the subsequent meeting was recorded.   MEJIAS and an individual known as Ron, last name unknown, ("Ron LNU") were observed exiting a taxi in the area.   MEJIAS approached and entered the UC vehicle and Ron LNU walked in the direction of a nearby building.

16.   MEJIAS indicated that he was going to get the firearm, but that he was concerned about crossing the street with a rifle.   The UC indicated that he would park the UC vehicle in front a e.v. of nearby building so that MEJIAS would not need to cross the street with the firearm.   MEJIAS agreed and asked the UC to call MEJIAS prior to MEJIAS bringing out the firearm so that the UC could advise him that the area was clear from any law enforcement presence.

17.   MEJIAS exited the UC vehicle and walked towards a nearby building.   The UC then parked the UC vehicle in front of the building as agreed.   The UC called MEJIAS shortly thereafter, and the defendant indicated that he was wrapping the rifle and would be down in a few minutes.   MEJIAS next approached the UC vehicle carrying a long object in his arms.   MEJIAS gave the UC a .22 caliber rifle, along with one round of long rifle ammunition.

The UC gave MEJIAS $300 for the rifle and the ammunition.  MEJIAS subsequently exited the UC vehicle and was observed entering a nearby building.

18.  On March 3, 2011, the UC and CI drove to meet the defendant at pre-determined location in the vicinity of East 53rd Street and Avenue T in Brooklyn, New York.  MEJIAS was observed exiting a black Mercedes Benz near the pre-determined location. The UC was equipped with a transmitter and an electronic recording device and the subsequent meeting was recorded.  MEJIAS entered the UC vehicle carrying a plastic bag.

19.  MEJIAS gave the UC an unloaded J.P. Sauer .32 caliber pistol, 59 rounds of .32 caliber ammunition and an additional firearm magazine.  The UC gave MEJIAS $700 for the handgun and the ammunition. The UC also provided MEJIAS $20 after the defendant complained of paying $31 for taxi fare.

20.  On April 11, 2011, the UC and CI drove to meet MEJIAS in a pre-determined location in the vicinity of East 53rd Street and Avenue T in Brooklyn, New York.  The UC was equipped with a transmitter and an electronic recording device and the subsequent meeting was recorded.

21.  MEJIAS arrived at the location and entered the UC vehicle holding a black computer bag over his shoulder and an additional shoulder bag.  MEJIAS gave the UC a GSG .22 caliber pistol, a small box of .22 caliber ammunition and one magazine

with several rounds of .22 caliber ammunition.  MEJIAS opened the second bag, which contained several knives, and asked the UC if he wished to purchase them.  The UC declined and gave MEJIAS $500, as agreed, for the pistol.  At that point, after borrowing $20 from the CI, MEJIAS exited the vehicle.

22.    I have consulted with an ATF interstate nexus expert and determined that none of the above-mentioned firearms were manufactured in New York State.

23.    I have reviewed ATF records and have confirmed that the defendant BRANDON MEJIAS is not a licensed importer, licensed manufacturer, licensed dealer or licensed collector of firearms.

24.   I have reviewed the defendant's criminal history record and have determined that he was convicted in the State of New York of the following crimes punishable by a term of imprisonment of more than one year, to wit, (1) Burglary in the 2nd Degree; (2) Attempted Burglary in the 3rd Degree; and (3) Attempted Burglary in the 2nd Degree.

WHEREFORE, your deponent respectfully requests that the defendant BRANDON MEJIAS be dealt with according to law.

Eli Vitrano
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Sworn to before me this
15th day of June.

Th
UN
EA